1435

Lavern T. SIMMONS, Administratrix of the Estate of Shuler Simmons, for the Estate and for herself as statutory beneficiary, Appellant-Respondent v. Thomas R. WILLIAMSON, Respondent, and The County of Charleston, Respondent-Appellant.

(387 S. E. (2d) 698)

Court of Appeals

*Ray P. McClain,* and *G. Daniel Bowling,* Charleston, *for appellant-respondent.*

*Thomas J. Wills, IV* and *Aubrey R. Alvey,* Barnwell, *Whaley, Patterson & Helms,* Charleston, *for respondent and respondent-appellant.*

Heard Nov. 14, 1989.

Decided Dec. 18, 1989.

*Per Curiam:*

Appellant-respondent, Lavern T. Simmons, Administratrix of the Estate of Shuler Simmons, for the Estate and for herself as statutory beneficiary, brought an action against Thomas R. Williamson, respondent, and respondent-

appellant, the County of Charleston. The jury awarded $25,000 against the county and found for defendant Williamson. The county and Simmons appeal. We affirm in part, reverse in part and remand for a new trial.

## FACTS

During the evening of July 29, 1985, Shuler Simmons was drinking at a local club. About 4:30 a.m. the next morning, Williamson, a Charleston County police officer found Simmons lying on the roadway at an intersection, two or three feet into the paved, traveled portion. Simmons told the officer he had become sleepy and laid down in the road because it was warm. Williamson asked Simmons if he knew where he was and Simmons replied correctly. Williamson then asked for identification; Simmons produced his identification card without any apparent fumbling or hesitation. Simmons gave his name and where he was going and he said he was going home to the address on his identification card. In fact, Simmons had moved to a different address. Williamson did not inquire about Simmons' drinking.

Williamson then told Simmons to stand in front of the cruiser with his hands by his sides. Williamson called his dispatcher and determined that there were no outstanding warrants on Simmons. He could have asked a supervisor for permission to transport Simmons, but he did not do so. In all, Williamson observed Simmons standing for some five to ten minutes. While Simmons was standing in front of Williamson's patrol car, an acquaintance of Simmons, Glen Chiasson, drove by, observed Simmons briefly and was of the opinion that Simmons appeared drunk. Chiasson also testified that at the time he observed Simmons, it was dark and Simmons was illuminated only by the headlights of the two vehicles and the blue light of Williamson's patrol car. He further stated that it was hard to tell if Simmons was drunk unless you talked to him.

After speaking with his dispatcher, Williamson returned Simmons' identification card and told him that he could either go home or go to jail. Simmons stated that he would like to go home. Williamson then instructed Simmons to stay on the right side of the road. Williamson watched Simmons obeying his instruction as he walked away.

Williamson initially explained, at the coroner's inquest, that he instructed Simmons to walk with his back to the traffic because "that's the side of the road that he was lying on and I figured that was the side that he wanted to stay on." Williamson testified that he observed Simmons walk on the pavement for approximately 30 or 40 feet during which time he did not see Simmons stumble or weave back and forth. Williamson further testified that Simmons' speech was very clear to him and at no time did Simmons slur his words nor did Williamson have difficulty understanding him.

The roadway where Williamson encountered Simmons was a two-lane asphalt road with no paved shoulders. The grass on the shoulders at the point where Williamson found Simmons asleep in the road was too high to walk on the shoulder without getting wet from the grass. There were no lights near the point in the road where Williamson initially found Simmons asleep. There were no lights on the side of the road where Simmons was lying, the side that Williamson told him to continue walking on, between the point of encounter and the point where Simmons was subsequently struck and killed, a distance of slightly less than one mile. At the point where Simmons was struck and killed, there were two street lights on the opposite side of the road from where he was walking approximately four hundred feet apart. Although the record is not clear exactly where Simmons was struck, or the condition of the shoulder at that point, where his body was found,the grass on the shoulder had been cut.

According to defendants' expert, standard police procedure required that Williamson stop to investigate the man, Simmons, lying on a paved roadway, to determine if he needed assistance. Defendants' expert further stated that if a police officer's investigation disclosed that a person was in a grossly intoxicated condition and unable to provide for his own safety, the officer had an obligation to assist him.

The autopsy found the decedent's blood alcohol level to be 153 milligrams per deciliter or .153%; there was expert testimony that, at the time of Simmons' encounter with Officer Williamson, the blood alcohol level would have been between .161% and .171%. The autopsy further found that decedent was in good health, including the condition of his liver.

Expert testimony was introduced at trial that a person with blood alcohol content of .160% or more is unlikely to be able to speak without slurring his speech, or to be able to walk without staggering. Both expert testimony and Officer Williamson's testimony were to the effect that a person with a blood alcohol content of .160% or more is likely to fail a standard field sobriety test.

Expert testimony and the autopsy indicated that dehydration might have been impairing Simmons' judgment when Williamson found him.

At approximately 5:15 a.m., a car driven by Steve Robertson struck Simmons and killed him. He testified he came over a small rise in the road and saw what he thought was a bag of trash. "And as I was approaching it, it started to get up out of the road." Simmons was in the road and Robertson did not leave the road to hit him.

## COUNTY'S APPEAL

The county appeals arguing the trial judge erred in failing to grant its motions for directed verdict and judgment notwithstanding the verdict. It first contends Simmons was contributorily negligent and reckless and the county did not proximately cause Simmons' death. We find there was sufficient evidence on these issues supporting the trial judge's decision to submit them to the jury.

The county also contends it was entitled to qualified immunity because Williamson's conduct in deciding whether to take Simmons off the street was discretionary. However, Mrs. Simmons alleged in her complaint negligence on the part of the county in implementing an inadequate training program. In its motion for directed verdict, the county failed to claim implementation of a training program was a discretionary act. Thus, we find no error in the trial judge's denial of the county's motions for directed verdict and judgment notwithstanding the verdict.

## SIMMONS' APPEAL

The Simmonses had been married since 1978. Simmons was 37 years old when he died; Mrs. Simmons was 30. They had no children but planned to have children.

Mrs. Simmons said Simmons was a "good working husband" and she loved him. There had been some domestic turmoil and Simmons' drinking had caused Mrs. Simmons to ask about an alcohol education program.

Mrs. Simmons is a high school graduate. She could not keep up the payments on their mobile home and later also lost a home she had started to buy.

Evidence revealed Simmons was a hardworker, reliable in his work habits and had steady employment during the marriage.

An expert stated Simmons' pre-trial earning loss was $21,936. Based on the mortality tables, Simmons had a life expectancy of 34 years. Funeral, headstone, and hospital expenses were $2,611.85. An expert testified the present value of the net economic loss to Mrs. Simmons was $321,009.

Mrs. Simmons and other witnesses testified her husband's death upset her deeply.

The jury returned a verdict of $25,000 damages. Counsel for plaintiff made timely motions for additur, for a new trial as to damages only, and for a new trial as to all issues on the ground of insufficiency of the award. The trial court refused to grant either a new trial absolute, new trial on damages, or a new trial nisi additur because of verdict inadequacy.

■ Motions for a new trial on the ground of inadequacy are addressed to the sound discretion of the trial judge. *Toole v. Toole*, 260 S. C. 235, 195 S. E. (2d) 389 (1973). Inadequacy is tested by whether the verdict is so shockingly low as to manifestly show that the jury was moved by considerations beyond the evidence and instructions of the court. *Id.* 195 S. E. (2d) at 391.

Mrs. Simmons has sought actual and punitive damages in this case. However, there is some evidence of Simmons' contributory negligence, which would bar recovery unless the defendants were grossly negligent. To fix damages, the jury must assess the character of acts which give rise to liability. Liability and damages might be too intertwined to allow a new trial on damages alone. *Carrigg v. Blue*, 283 S. C. 494, 323 S. E. (2d) 787 (Ct. App. 1984).

■ The grant of a new trial nisi additur is within the judge's discretion when the verdict is "so grossly inadequate as to be the result of prejudice and passion

or merely insufficient based on the evidence." *Jones v. Ingles Supermarkets, Inc.*, 293 S. C. 490, 361 S. E. (2d) 775 (Ct. App. 1987).

We hold the court committed an abuse of discretion amounting to an error of law when it refused the motions by plaintiff's attorney for a new trial as stated above.

We hold, in this case, the questions of liability and damages are inextricably intertwined and any measurement of damages necessarily depends on the jury's view of the facts giving rise to liability. *Carrigg* 361 S. E. (2d) at 790.

In view of this disposition, we hold it is unnecessary to address the remaining issues.

Affirmed in part, reversed in part and remanded.